IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO.: <u>6:17cr418</u> |
| | ) | |
| vs. | ) | |
| | ) | |
| COURTNEY EUGENE HARRIS | ) | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S
MOTION TO REDUCE SENTENCE
PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i)**

Defendant COURTNEY EUGENE HARRIS (Harris) has filed a motion asking this Court to reduce his sentence of imprisonment under 18 U.S.C. § 3582(c)(1)(A) and order his immediate release, relying in total on the threat posed by the COVID-19 pandemic. The United States respectfully opposes the motion. This Court should deny the motion without prejudice for Defendant's failure to exhaust administrative remedies. Should the Court reach the merits, it should deny the motion with prejudice because Harris has not met his burden of establishing that a sentence reduction is warranted under the statute.

**FACTUAL BACKGROUND**

Harris was charged in a three-count superseding indictment filed on June 13, 2017. ECF # 26. Count one charged him with being a felon in possession of a firearm, in violation of Title 18, U.S.C. 922(g)(1); count two charged possession with intent to distribute a quantity of cocaine, in violation of Title 21, U.S.C. 841(a)(1); and count three charged possession of a firearm in furtherance of a drug trafficking crime, in violation of Title 18, U.S.C. 924(c)(1)(A). On June 19, 2017, Harris pled guilty pursuant to a plea agreement to

count three of his superseding indictment.  ECF # 32.  On October 27, 2017, the court sentenced Harris to the statutory mandatory minimum of 60 months imprisonment followed by five years of supervised release.  ECF # 46.  On July 15, 2019, Harris filed a motion to reduce his sentence which the Court denied on November 1, 2019.  ECF # 49, 56.  Harris filed the present motion for compassionate release on January 27, 2021.  ECF # 62.

## I.  BOP'S RESPONSE TO THE COVID-19 PANDEMIC

As this Court is well aware, COVID-19 is an extremely dangerous illness that has caused many deaths in the United States in a short period of time and that has resulted in massive disruption to our society and economy.  In response to the pandemic, BOP has taken significant measures to protect the health of the inmates in its charge.

### A.  BOP's Modified Operations Plan

BOP has explained that "maintaining safety and security of [BOP] institutions is [BOP's] highest priority."  BOP, Updates to BOP COVID-19 Action Plan: Inmate Movement (Mar. 19, 2020), available at https://www.bop.gov/resources/news/20200319_covid19_update.jsp.

Indeed, BOP has had a Pandemic Influenza Plan in place since 2012.  BOP Health Services Division, Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf.  That protocol is lengthy and detailed, establishing a multi-phase framework requiring BOP facilities to begin preparations when there is first a "[s]uspected human outbreak overseas."

*Id.* at i.  The plan addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.

Consistent with that plan, BOP began planning for potential coronavirus transmissions in January 2020.  At that time, the agency established a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control, including by reviewing guidance from the World Health Organization.

On March 13, 2020, BOP began to modify its operations, in accordance with its Coronavirus (COVID-19) Action Plan ("Action Plan"), to minimize the risk of COVID-19 transmission into and inside its facilities.  Since that time, as events require, BOP has repeatedly revised the Action Plan to address the crisis.

BOP's operations are presently governed by Phase Nine of the Action Plan.  The current modified operations plan limits inmate movement to prevent congregate gathering and maximize social distancing.  Essential inmate work details continue to operate with appropriate screening.  Limited group gathering is afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access.

Temperature checks and COVID-19 screening are being conducted for all staff, contractors, and other visitors to BOP institutions.  Those who register a temperature of 100.4 degrees Fahrenheit or higher are denied access to the building.  To the extent possible, staff are being assigned to the same posts and not rotation to help mitigate the spread of the virus.  All non-official staff travel has been suspended, as has all in-person staff training except for basic training for new staff and OSHA-mandated certifications.

BOP has also modified its operations regarding inmate transfer between facilities, to other correctional jurisdictions, or out of BOP custody. Inmates with no prior history of COVID-19 are tested before transfer. If they test negative, they are placed in quarantine for 14 days and transferred if they test negative again on Day 14. Inmates with active COVID-19 who continue to require isolation are not released or transferred unless necessary. Inmates being immediately released under judicial or statutory requirements are provided a symptom screen, temperature check, and rapid COVID-19 test on the day of departure. Local health authorities in the receiving locality are notified, and the inmate is required to wear a face-covering while in route to his or her destination.

All staff and inmates have been and will continue to be issued facemasks and strongly encouraged to wear an appropriate face covering when in public areas when social distancing cannot be achieved.

Contractor access to BOP facilities is restricted to only those performing essential services (e.g. medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. Contractors will undergo advanced health screening in accordance with the protocols for prison staff. All volunteer visits are suspended absent authorization by the Deputy Director of BOP. Volunteers who are approved for access also undergo a COVID-19 screening and temperature check.

Social and legal visits were stopped from March 13, 2020 until October 3, 2020, to limit the number of people entering the facility and interacting with inmates. *See* BOP, Bureau to Resume Social Visitation (Sept. 2, 2020), available at https://www.bop.gov/resources/news/20200902_visitation.jsp. Social visits are now being

reinstated where possible to maintain the safety of staff, inmates, visitors, and communities. All visits will be non-contact, and social distancing between inmates and visitors will be enforced either through the use of Plexiglas or similar barriers or through physical distancing. Inmates in quarantine or isolation will not participate in social visiting. All other inmates will have an opportunity for in-person visits at least twice a month. Visitors will be symptom screened and temperature checked and will not be allowed entry if they are sick or symptomatic. Inmates and visitors will be required to wear appropriate face coverings at all times and will perform hand hygiene just before and after the visit.

Tours of facilities remain suspended. In-person legal visits are accommodated upon request, based upon local resources, and will follow preventative protocols. Telephone calls and/or video conferencing with outside counsel is accommodated to the extent possible.

Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

### B.    BOP's Distribution of COVID-19 Vaccines

As of January 8, 2021, nineteen BOP facilities—including all of its medical facilities—had received initial allotments of COVID-19 vaccines. BOP is prioritizing staff for vaccination because staff members come and go between the facility and the community and thus present a higher potential vector for transmission both in the facility and in the community at large. Vaccines are distributed to inmates, prioritizing those in

high-risk categories, as soon as they become available. As of January 24, 2021, the BOP has received 24,750 doses of vaccine with 20,082 already administered.[1] 18,965 inmates have received one dose and 5,044 have already had two doses.[2] 99,620 inmates have completed testing and there are 1,250 pending tests.[3] There have been 43,735 inmates who have ever had a positive test.[4]

### C.    BOP's Designation of Inmates for Home Confinement

In addition, in an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g).

Congress has also acted to enhance BOP's flexibility to respond to the pandemic. Under the Coronavirus Aid, Relief, and Economic Security Act, enacted on March 27, 2020, BOP may "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" if the Attorney General finds that

---

[1] https://covid.cdc.gov/covid-data-tracker/#vaccinations
[2] *Id*.
[3] https://www.bop.gov/coronavirus
[4] *Id*.

emergency conditions will materially affect the functioning of BOP. Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note). On April 3, 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion, beginning at the facilities that thus far have seen the greatest incidence of coronavirus transmission.

Taken together, all of these measures are designed to mitigate sharply the risks of COVID-19 transmission in a BOP institution. BOP has pledged to continue monitoring the pandemic and to adjust its practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

Unfortunately, and inevitably, some inmates have become ill, and more likely will in the weeks ahead. But BOP must consider its concern for the health of its inmates and staff alongside other critical considerations. For example, notwithstanding the current pandemic crisis, BOP must carry out its charge to incarcerate sentenced criminals to protect the public. It must consider the effect of a mass release on the safety and health of both the inmate population and the citizenry. It must marshal its resources to care for inmates in the most efficient and beneficial manner possible. It must assess release plans, which are essential to ensure that a defendant has a safe place to live and access to health care in these difficult times. And it must consider myriad other factors, including the availability of both transportation for inmates (at a time that interstate transportation services often used by released inmates are providing reduced service), and supervision of inmates once

released (at a time that the Probation Office has necessarily cut back on home visits and supervision).

As of January 27, 2021, the BOP nationwide has 123,306 federal inmates in BOP-managed institutions and 13,795 in community-based facilities.[5]   The BOP staff complement is approximately 36,000.   There are 3,081 federal inmates and 1,965 BOP staff who have confirmed positive test results for COVID-19 nationwide.[6]   Currently, 42,617 inmates and 4,065 staff have recovered.[7]   There have been 209 federal inmate deaths and 3 staff member deaths attributed to the COVID-19 disease.[8]

Currently, the BOP has 7,807 inmates on home confinement.[9]   The total number of inmates placed in home confinement from March 26, 2020 to the present (including inmates who have completed service of their sentence) is 20,924.[10]

Of the inmate deaths, four occurred while on home confinement.[11]   Harris is housed at McCreary USP, in Kentucky, and presently has a release date of March 6, 2022.[12]   As of January 27, 2021, at McCreary USP twenty-four inmates and twelve staff are presently COVID positive.[13]   McCreary USP houses 1,388 inmates.[14]

---

[5] https://www.bop.gov/coronavirus/
[6] *Id*.
[7] *Id.*
[8] *Id.*
[9] *Id.*
[10] *Id.*
[11] *Id.*
[12] *Id.*
[13] https://www.bop.gov/coronavirus/
[14] https://www.bop.gov/locations/institutions/edg/

**LEGAL FRAMEWORK**

Under 18 U.S.C. § 3582(c)(1)(A), this Court may, in certain circumstances, grant a defendant's motion to reduce his or her term of imprisonment.  Before filing that motion, however, the defendant must first request that BOP file such a motion on his or her behalf. § 3582(c)(1)(A).  A court may grant the defendant's own motion for a reduction in his sentence only if the motion was filed "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or after 30 days have passed "from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.*

If that exhaustion requirement is met, a court may reduce the defendant's term of imprisonment "after considering the factors set forth in [18 U.S.C. § 3553(a)]" if the Court finds, as relevant here, that (i) "extraordinary and compelling reasons warrant such a reduction." § 3582(c)(1)(A)(i).  As the movant, the defendant bears the burden to establish that he or she is eligible for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016); *United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014).

The Sentencing Commission has issued a policy statement addressing reduction of sentences under § 3582(c)(1)(A).  The policy statement includes an application note that specifies the types of medical conditions that qualify as "extraordinary and compelling reasons."  First, that standard is met if the defendant is "suffering from a terminal illness," such as "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, [or] advanced dementia."  USSG § 1B1.13, cmt. n.1(A)(i).  Second, the standard is met if the defendant is:

> (I) suffering from a serious physical or medical condition,
>
> (II) suffering from a serious functional or cognitive impairment, or
>
> (III) experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

USSG § 1B1.13, cmt. n.1(A)(ii). The application note also sets out other conditions and characteristics that qualify as "extraordinary and compelling reasons" related to the defendant's age and family circumstances. USSG § 1B1.13, cmt. n.1(B)-(C). Finally, the note recognizes the possibility that BOP could identify other grounds that amount to "extraordinary and compelling reasons." USSG § 1B1.13, cmt. n.1(D).

In *United States v. McCoy*, 981 F.3d 271, 281–83 (4th Cir. 2020), the Fourth Circuit held the policy statement found in U.S.S.G. § 1B1.13—which applies to reductions in terms of imprisonment under § 3852(c)(1)(A)—does not apply to compassionate release motions *brought by inmates* under § 3582(c)(1)(A)(i).[15] Under *McCoy*, because § 1B1.13 specifies its applicability only to motions brought by the Bureau of Prisons, it cannot be the policy statement applicable in circumstances where defendants bring their own motions for compassionate release. *Id*. In place of the no-longer-applicable policy statement, *McCoy* permits "courts [to] make their own independent determinations of what constitutes

---

[15] The mandate in *McCoy* has not yet issued. Any petition for rehearing or rehearing en banc in the Fourth Circuit is due January 15, 2020. *United States v. McCoy*, No. 20-6821, ECF No. 75 (4th Cir. Dec. 14, 2020). The Fourth Circuit's judgment in *McCoy* is not final until the mandate issues; "at that time the parties' obligations become fixed." Fed. R. App. P. 41, advisory committee notes to 1998 Amendments; *see also Alphin v. Henson*, 552 F.2d 1033, 1035 (4th Cir. 1977) ("Our control over a judgment of court continues until our mandate has issued . . . ."); *Charpentier v. Ortco Contractors*, 480 F.3d 710, 713 (5th Cir. 2007) ("This court retains control over an appeal until we issue a mandate. Before our mandate issues, we have the power to alter or modify our judgment. Accordingly, our decision is not final until we issue a mandate.").

an 'extraordinary and compelling reason[ ]' under § 3582(c)(1)(A), as consistent with the statutory language[.]" *Id*. at 284.

*McCoy* noted, however, that § 1B1.13 "remains helpful guidance even when motions are filed by defendants." *Id*. at 282 n.7. It approvingly cited the Seventh Circuit's recent decision in *United States v. Gunn*, 980 F.3d 1178 (7th Cir. 2020), which similarly held that there currently exists no applicable policy statement for compassionate release motions brought by inmates. Nonetheless, the Seventh Circuit explained that § 1B1.13 remains useful in framing a court's inquiry as to what constitutes "extraordinary and compelling reasons." As it stated:

> The statute itself sets the standard: only 'extraordinary and compelling reasons justify the release of a prisoner who is outside the scope of § 3582(c)(1)(A)(ii). The substantive aspects of the Sentencing Commission's analysis in § 1B1.13 and its Application Notes provide a working definition of 'extraordinary and compelling reasons'; a judge who strikes off on a different path risks an appellate holding that judicial discretion has been abused. In this way the Commission's analysis can guide discretion without being conclusive.

*Id*. at 1180 (citing *Gall v. United States*, 552 U.S. 38, 49–50 (2007); *Kimbrough v. United States*, 552 U.S. 85 (2007)). Thus, although *McCoy* broadened courts' discretion under § 3582(c)(1)(A), it nonetheless appeared to envision a system whereby courts continue to be guided by the existing policy statement.

According to Harris' own motion he has failed to first seek relief from the Bureau of Prisons (BOP) as required. ECF # 62, p 1. On January 27, 2021, counsel for the BOP informed the government that upon checking the records at McCreary USP there is no

record of Harris filing a request with the warden.  Accordingly, the issue is not ripe for this Court to address.

## ARGUMENTS

This Court should deny Defendant's motion for a reduction in his sentence without prejudice because Harris has failed to exhaust administrative remedies.  Should the Court reach the merits of the motion, the Court should deny it with prejudice on either of two independently sufficient grounds.  First, Harris has not established that "extraordinary and compelling reasons" support a sentence reduction; second, Harris has not met his burden to show that a reduction is warranted in light of the danger that he would pose to the community and the relevant § 3553(a) factors.

## I.    THIS COURT SHOULD DENY THE MOTION WITHOUT PREJUDICE BECAUSE HARRIS HAS NOT EXHAUSTED ADMINISTRATIVE REMEDIES.

This Court lacks authority to act on Harris's motion for a sentence reduction currently.  As explained above, § 3582(c) requires that a request for a sentence reduction be presented first to BOP for its consideration; only after 30 days have passed, or the defendant has exhausted all administrative rights to appeal the BOP's failure to move on the defendant's behalf, may a defendant move for a sentence reduction in court.  That restriction is a mandatory claim-processing rule, and it continues to serve an important function during the present crisis.[16]  The Government is very mindful of the concerns

---

[16] In earlier responses to motions for compassionate release, the Government has argued that the exhaustion requirement is jurisdictional.  In light of updated guidance from the Department of Justice and recent Supreme Court precedent stressing "the distinction between jurisdictional prescriptions" on the one hand and "nonjurisdictional claim-

created by COVID-19, and BOP is making its best effort both to protect the inmate population and to address the unique circumstances of individual inmates.

"'[A] judgment of conviction that includes [a sentence of imprisonment] constitutes a final judgment' and may not be modified by a district court except in limited circumstances." *Dillon v. United States*, 560 U.S. 817, 824 (2010). As the Supreme Court has recognized, finality is an important attribute of criminal judgments, and one "essential to the operation of our criminal justice system." *Teague v. Lane*, 489 U.S. 288, 309 (1989) (plurality opinion). Accordingly, it is well established that once a district court has pronounced sentence and the sentence becomes final, the court has no inherent authority to reconsider or alter that sentence. Rather, it may do so only if authorized by statute. *See, e.g.*, *United States v. Addonizio*, 442 U.S. 178, 189 & n.16 (1979); *United States v. Washington*, 549 F.3d 905, 917 (3d Cir. 2008); *United States v. Smartt*, 129 F.3d 539, 540 (10th Cir. 1997) ("A district court does not have inherent authority to modify a previously imposed sentence; it may do so only pursuant to statutory authorization.") (internal quotation marks omitted).

Consistent with that principle of finality, § 3582(c) provides that a court *may not* modify a term of imprisonment once it has been imposed *unless* "upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request

---

processing rules" on the other, *See, e.g.*, *Fort Bend County*, 139 S. Ct. 1843, 1849 (2019), the United States submits that it is instead a nonjurisdictional, mandatory claim-processing rule.

by the warden of the defendant's facility, whichever is earlier . . . ." § 3582(c)(1)(A). "The statute's language is mandatory." *United States v. Franco*, 973 F.3d 465, 468 (5th Cir. 2020). "It is a paradigmatic mandatory claim-processing rule." *Id.* Contrary to Defendant's assertion, the requirement that a defendant either exhaust administrative appeals or wait 30 days after presenting a request to the warden before seeking judicial relief is mandatory and must be enforced by the Court. As the Third Circuit recently confirmed, where 30 days have not passed following presentation of a request to a warden, the statute "presents a glaring roadblock foreclosing compassionate release at this point." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020); *see also Franco*, 2020 WL 5249369, at *2; *United States v. Alam*, 960 F.3d 831, 833–34 (6th Cir. 2020); *United States v. Springer*, 820 F. App'x 788, 791–92 (10th Cir. 2020) (unpublished).

The exhaustion requirement of § 3582(c)(1)(A) is a mandatory claim-processing rule and must be enforced if a party "properly raise[s]" it. *Eberhart v. United States*, 546 U.S. 12, 19 (2005) (holding that Fed. R. Crim. P. 33, which permits a defendant to move for a new trial within 14 days of the verdict, is a nonjurisdictional but mandatory claim-processing rule). The Government raises the rule here, and it must be enforced. *Alam*, 960 F.3d at 833–34 (holding § 3582(c)(1)(A)'s 30-day requirement is an "unyielding procedural requirement" that "must be enforced," and no equitable exception to the requirement exists to account for irreparable harm or futility); *Franco*, 2020 WL 5249369, at *2.

Harris concedes that he has failed to exhaust his / her administrative requirements under § 3582(c)(1)(A). He nevertheless proceeds to argue that this Court may ignore the

exhaustion requirement considering the crisis presented by the coronavirus pandemic. That is incorrect. It is well settled that a court may not ignore a statutory command such as that presented in § 3582(c)(1)(A). *McCarthy v. Madigan*, 503 U.S. 140, 144 (1992) ("[w]here Congress specifically mandates, exhaustion is required"); *Alam*, 960 F.3d at 834. Indeed, the Supreme Court recently reaffirmed that principle in *Ross v. Blake*, 136 S. Ct. 1850 (2016), in which it rejected a judicially created "'special circumstances'" exception to a statutory exhaustion requirement. Rejecting the "freewheeling approach" adopted by some courts of appeals, under which some prisoners were permitted to pursue litigation even when they had failed to exhaust available administrative remedies, *Ross*, 136 S. Ct. at 1855, the Court demanded fidelity to the statutory text, explaining that the "mandatory language" of the exhaustion requirement "means a court may not excuse a failure to exhaust" even to accommodate exceptional circumstances, *id.* at 1856.

Some inmates have suggested that the exhaustion requirement of § 3582(c)(1)(A) may be excused by a court as "futile" during the present pandemic. But there is no "futility" exception in the statute, and the Supreme Court has made clear that courts have no authority to invent an exception to a statutory exhaustion requirement. The Sixth Circuit has rejected the argument that any such futility exception exists under § 3582. *Alam*, 960 F.3d at 834 (declining to impose a futility exception and explaining, "Preventing prisoners from charging straight to federal court serves important purposes. It ensures that the prison administrators can prioritize the most urgent claims. And it ensures that they can investigate the gravity of the conditions supporting compassionate release and the likelihood that the conditions will persist. These are not interests we should lightly dismiss

or re-prioritize."); *see also United States v. Holden*, 2020 WL 1673440, at *5 (D. Or. Apr. 6, 2020); *United States v. Eberhart*, 2020 WL 1450745, at *1 (N.D. Cal. Mar. 25, 2020).[17] And in any event, a request in this context is not futile because, as explained further below, BOP fully considers requests for sentence reductions. Indeed, BOP often concurs with such requests.

The requirement of a 30-day period to afford BOP the initial review of the defendant's request therefore cannot be excused where the Government timely raises the issue.

Accordingly, Harris's motion should be denied without prejudice to refiling after he has exhausted administrative remedies.

## II.    SHOULD THE COURT REACH THE MERITS, IT SHOULD DENY THE MOTION BECAUSE HARRIS HAS FAILED TO PRESENT ANY "EXTRAORDINARY AND COMPELLING REASONS" WARRANTING A SENTENCE REDUCTION AND BECAUSE HE POSES A DANGER TO PUBLIC SAFETY.

---

[17] While a few district courts have incorrectly excused the § 3582 exhaustion requirement as futile, many of those decisions have rested on the fact that the defendant had a matter of days left to serve on the sentence, a consideration not present in this case. *See, e.g.*, *United States v. Colvin*, 2020 WL 1613943, at *1 (D. Conn. Apr. 2, 2020) (finding exhaustion futile because inmate had 11 days left on her sentence); *United States v. Perez*, 2020 WL 1546422, at *1 (S.D.N.Y. Apr. 1, 2020) (finding exhaustion futile because inmate had less than 21 days left on his sentence and was recovering from two vicious beatings while in prison); *but see United States v. Zukerman*, 2020 WL 1659880, at *1 (S.D.N.Y. Apr. 3, 2020) (finding exhaustion futile where obese, 75-year old inmate suffered from diabetes and hypertension). At least one of those decisions incorrectly relied on precedent addressing a judicially created—as opposed to statutorily created—exhaustion requirement. *See Perez*, 2020 WL 1546422 at *2 (relying only on *Washington v. Barr*, 925 F.3d 109, 118 (2d Cir. 2019)).

To the extent *Perez* also suggests that *Mathews v. Eldridge*, 424 U.S. 319 (1976), supports an exception to the exhaustion requirement here, *see* 2020 WL 1546422, at *2 n.2, that is incorrect. In *Eldridge*, the claimant complied with the "nonwaivable and nonexcusable requirement that an individual present a claim to the agency before raising it in court." *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 16 (2000). And while the Court in *Eldridge* recognized that a constitutional challenge "entirely collateral to [the claimant's] substantive claim of entitlement" might evade a statutory exhaustion requirement, 424 U.S. at 330, Defendant's claim for relief in this Court is the same claim he was required to present to BOP. *See also United States v. Demaria*, 2020 WL 1888910, at *3 & n.8 (S.D.N.Y. Apr. 16, 2020) (explaining the *Perez* error at length and the inapplicability of the cases on which it relied).

Even if this Court had authority to grant Harris's motion for a reduction of his sentence, it should be denied for two reasons.  First, Harris has not identified "extraordinary and compelling reasons" for that reduction within the meaning of § 3582(c)(1)(A).  Second, he poses a significant danger to the public and the statutory sentencing factors do not weigh in favor of his release.

### A.     Harris Has Not Identified "Extraordinary and Compelling Reasons" for a Sentence Reduction.

Harris has not demonstrated "extraordinary and compelling reasons" warranting release.  As explained above, under the relevant provision of § 3582(c), a court can grant a sentence reduction only if it determines that "extraordinary and compelling reasons" justify the reduction.   18 U.S.C. § 3582(c)(1)(A)(i).   And although the policy statement is not binding on district courts considering compassionate release motions filed by inmates, § 1B1.13 "remains helpful guidance[.]"  *McCoy*, 981 F.3d at 282 n.7.

The Sentencing Commission's policy statement defines "extraordinary and compelling reasons" to include, as relevant here, certain specified categories of medical conditions.   USSG § 1B1.13, cmt. n.1(A).   Those categories include, as particularly relevant here, (i) any terminal illness, and (ii) any "serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." USSG 1B1.13, cmt. n.1(A).

The mere existence of the COVID-19 pandemic, which poses a general threat to every non-immune person in the country, does not fall into either of those categories and

therefore should not alone provide a basis for a sentence reduction. The categories encompass specific serious medical conditions afflicting an individual inmate, not generalized threats to the entire population. As the Third Circuit has held, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020); *see also United States v. Eberhart*, 2020 WL 1450745, at *2 (N.D. Cal. Mar. 25, 2020) ("a reduction of sentence due solely to concerns about the spread of COVID-19 is not consistent with the applicable policy statement of the Sentencing Commission as required by § 3582(c)(1)(A).").[18] To classify COVID-19 as an extraordinary and compelling reason would not only be inconsistent with the text of the statute and the policy statement, but it would be detrimental to BOP's organized and comprehensive anti-COVID-19 regimens, could result in the scattershot treatment of inmates, and would undercut the strict criteria BOP employs to determine individual inmates' eligibility for sentence reductions and home confinement. Section 3582(c)(1)(A) contemplates sentence reductions for specific individuals, not the widespread prophylactic release of inmates and the modification of lawfully imposed sentences to deal with a world-wide viral pandemic.

---

[18] *See also, e.g.*, *United States v. Coles*, 2020 WL 1899562 (E.D. Mich. Apr. 17, 2020) (denied for 28-year-old inmate at institution with outbreak); *United States v. Okpala*, 2020 WL 1864889 (E.D.N.Y. Apr. 14, 2020); *United States v. Weeks*, 2020 WL 1862634 (S.D.N.Y. Apr. 14, 2020); *United States v. Haney*, 2020 WL 1821988 (S.D.N.Y. Apr. 13, 2020) (denied for 61-year-old with no other conditions); *United States v. Pinto-Thomaz*, 2020 WL 1845875 (S.D.N.Y. Apr. 13, 2020) (two insider trading defendants with less than a year to serve have no risk factors); *United States v. Korn*, 2020 WL 1808213, at *6 (W.D.N.Y. Apr. 9, 2020) ("in this Court's view, the mere *possibility* of contracting a communicable disease such as COVID-19, without any showing that the Bureau of Prisons will not or cannot guard against or treat such a disease, does not constitute an extraordinary or compelling reason for a sentence reduction under the statutory scheme."); *United States v. Carver*, 2020 WL 1892340 (E.D. Wash. Apr. 8, 2020).

First, Harris has not provided any documentation for his asserted medical condition, nor do BOP medical records substantiate his claims. Harris therefore cannot meet his burden to establish his entitlement to a sentence reduction on that ground alone. Harris identified asthma as a medical condition that he suffers from. ECF # 62, p. 61. That is not identified as a medical condition that falls within one of the categories specified in the policy statement's application note. That is, he does not suffer from (i) any terminal illness, and (ii) any "serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." USSG 1B1.13, cmt. n.1(A). Harris's asserted condition does not itself rise to the level of severity required under the policy statement.

Defendant claims he suffers from asthma, a condition the CDC has concluded "might" increase the risk of illness from COVID-19.

According to the Centers for Disease Control (CDC) "People of any age with the following conditions *are at increased risk* of severe illness from COVID-19: Cancer, Chronic kidney disease, COPD (chronic obstructive pulmonary disease), Immunocompromised state (weakened immune system) from solid organ transplant, Obesity (body mass index [BMI] of 30 or higher), Serious heart conditions, such as heart failure, coronary artery disease, or cardiomyopathies, Sickle cell disease, and Type 2 diabetes mellitus."[19]   From a review of his own motion and his medical records provided

---

[19] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2F

by the BOP, Harris suffers from none of these factors.  (**See sealed medical records, 2019, 2020, 2021**)

The CDC also notes "people with the following conditions *might be* at an increased risk for severe illness from COVID-19:  Asthma (moderate-to-severe); Cerebrovascular disease (affects blood vessels and blood supply to the brain); Cystic fibrosis; Hypertension or high blood pressure; Immunocompromised state (weakened immune system) from blood or bone marrow transplant; immune deficiencies; HIV; use of corticosteroids; or use of other immune weakening medicines; Neurologic conditions, such as dementia; Liver disease; Pregnancy; Pulmonary fibrosis (having damaged or scarred lung tissues); Smoking; Thalassemia (a type of blood disorder); and Type 1 diabetes mellitus."[20]

From a review of the medical records it appears Harris is diagnosed with asthma and it is currently under control by treatment in the BOP.  (See sealed medical records 2019, at p. 4., 2020, at p. 3., 2021, at p1.)  One District Court in the District of South Carolina has noted in another case seeking compassionate relief, that asthma is not, in itself sufficient enough of a risk factor to constitute an extraordinary and compelling reason for release.  (See Case 4:18-0084-RBH, United States v. Jenkins, et al…)

Accordingly, Harris has not established an "extraordinary and compelling reason" to be considered for a sentence reduction under § 3582(c).  His motion should be denied.

### III.    HARRIS STILL POSES A SIGNIFICANT DANGER TO THE SAFETY OF THE COMMUNITY AND THE § 3553(A) FACTORS STRONGLY WEIGH AGAINST HIS RELEASE.

---

[20] *Id.*

Alternatively, Harris's request for a sentence reduction should be denied because he has failed to demonstrate that he is not a danger to the safety of the community or otherwise merits release under the § 3553(a) factors.

At the present time, it is apparent that, but for the COVID-19 pandemic, Harris would present no basis for compassionate release. His medical condition is well-controlled and does not present any impediment to his ability to provide self-care in the institution.

The only question, then, is whether the risk of COVID-19 changes that assessment. This Court must consider all pertinent circumstances, including the § 3553(a) factors, and whether Harris is a possible danger to the community. Harris's medical condition is appropriately managed at the facility, which is also engaged in strenuous efforts to protect inmates against the spread of COVID-19 and would also act to treat any inmate who does contract COVID-19.

Harris provides no release plan for the Court to review. Instead he only accuses the BOP of falsely increasing his disciplinary history. However, when reviewing his BOP disciplinary record, it is replete with many, many instances of dangerous, violent, and disturbing behavior. (See sealed disciplinary record) The COVID-19 disease is sadly rampant in South Carolina, particularly in Greenville. As of this writing, Greenville County has had 53,974 positive tests and 663 deaths.[21] South Carolina has a recent positivity trend rate of more than 25%. According to the White House Coronavirus Task Force, "ranks Greenville and Spartanburg with metro areas like Provo, Utah, and Tulsa,

---

[21] https://www.wyff4.com/article/covid-19-in-south-carolina-north-carolina-georgia-tracking-cases-deaths-and-latest-restriction-jan25/35306811

6:17-cr-00418-JMC    Date Filed 02/03/21    Entry Number 67    Page 22 of 24

Oklahoma, among the mid-sized areas with the most cases per 100,000 people, highest percent positive rates and worst case trends over the last eight weeks." Greenville County ranks number one on the list while Spartanburg County ranks fifth in the nation.[22] The upstate of South Carolina has been and continues to be one hottest areas in the United States for Coronavirus positive cases. As of January 24, 2021, Greenville and Spartanburg counties ranked first and fourth respectively with the highest number of new cases in South Carolina.[23] (Last accessed January 25, 2021)

In addition, the § 3553(a) factors strongly disfavor a sentence reduction. Harris was convicted of possession of a firearm in furtherance of a drug trafficking crime and sentenced to 60 months imprisonment. According to the Pre-Sentence Report (PSR), on April 7, 2017, United States Probation Officers (USPOs) were conducting a home inspection at the residence of Harris. As USPOs pulled in Harris' driveway, he ran out the back door, knocked on their window. Harris ran back into his residence while telling USPOs to "come in." The USPOs noticed that Harris had latex gloves on his hands and a white powdery substance on the front of his clothes. USPOs entered the residence and noticed a white powdery substance on the kitchen table, a metal grinder, and multiple plastic baggies. Harris became agitated with the USPOs and admitted the white powdery

---

[22] https://www.wyff4.com/article/upstate-areas-among-the-worst-hit-by-covid-19-in-the-country-according-to-new-report/35162913
[23] https://www.google.com/search?source=hp&ei=f8kOYPCgNIuv5NoPtL-TiAo&q=new+COVID+case+total+for+S.C.&oq=new+COVID+case+total+for+S.C.&gs_lcp=CgZwc3ktYWIQAzIICCEQFhAdEB46CwguELEDEIMBEJMCOggIABCxAxCDAToICC4QsQMQgwE6CwguELEDEMcBEKMCOgsIABCxAxCDARDJAzoCCAA6BQgAELEDOggILhDHARCjAjoICAAQsQMQyQM6BQguELEDOgIILjoICC4QxwEQrwE6BQgBQgAEJIDOggIABCxAxCLAzoFCAAQyQM6BAgAEAo6BggAEBYQHjoJCAAQyQMQFhAeOggIABAIEA0QHjoKCAAQCBANEAoQHjoLCAAQyMQCBANEB5QuxBY61dgmVtoAHAAeACAAAXiIAagUkgEEMjMuNpgBAKABAaoBB2d3cy13aXXq4AQI&sclient=psy-ab&ved=0ahUKEwiw3IyRmrfuAhWLF1kFHbTfBKEQ4dUDCAw&uact=5#spf=1611581836594

Page **22** of **24**

substance was cocaine.  PSR ¶ 7.  Harris advised that he had more cocaine hidden under his bed and advised there was also a loaded firearm under the bed.  PSR ¶ 8.  Harris was in possession of 125.30 grams of crack cocaine and 45.6 grams of powder cocaine, while possessing a firearm.  PSR ¶ 11.

In applying the 3553(a) factors, particularly the need for the sentence to promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct; and to protect the public from further crimes of the defendant, Harris does not merit compassionate release.  In reviewing 18 U.S.C. 3553(a) it is instructive to look at his underlying conviction and to examine his prior criminal actions.  After being sentenced for various offenses, he continued to commit crimes.  Harris has state and federal criminal history dating to 1995 through 2002, excluding his federal conviction.  PSR ¶¶ 17-24.  His convictions include assault and battery with intent to kill (parole revoked) and armed robbery; breach of peace; trespassing x2; shoplifting; discharging firearm; malicious injury to personal property; conspiracy to possess with intent to distribute cocaine and crack cocaine x2); possession of firearm in relation to a drug trafficking crime (DSC); and the current federal conviction.  PSR ¶¶ 17-24.

The sentences previously imposed did not deter Harris from continuing criminal conduct.  He would pose a danger to public safety if released.  His behavior inside the BOP has been equal or worse than his conduct before prison.  Harris record contains forty-five pages of violation including setting a fire, possession of a razorblade, multiple instances of fighting, and many, many instances of disturbing and lewd sexual behavior toward female BOP employees.

## <u>CONCLUSION</u>

For these reasons, this Court should deny Harris's motion for a sentence reduction without prejudice for failure to exhaust administrative remedies or, in the alternative, deny his motion on the merits.

Respectfully submitted,

PETER M. MCCOY, JR.
UNITED STATES ATTORNEY

By:   *Max Cauthen*

Max B. Cauthen, III
Assistant U.S. Attorney
D.C. No. 6732
55 Beattie Place, Suite 700
Greenville, SC 29601
(864) 282-2100

February 3, 2021